UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 20-302(2) (ADM/ECW)

UNITED STATES OF AMERICA,

    Plaintiff,

v.

MELISSA HALLICH,

    Defendant.

**DEFENDANT'S POSITION PLEADING**

    First, it was a two bedroom apartment. He sent her a web link and explained that he really needed his own place so his young son could stay with him.  And once he had his own place, Ms. Hallich could come over all the time. Ms. Hallich had started a romantic relationship with him only days before his requests started coming.

    The texts started on June 28, 2020 and there were at least 783 texts in all. They met on Facebook through a mutual friend. And the texts started off sweet. He called her "boo," he complimented the way she looked, and the way she made him feel.  There are no records of other communications – the phone calls, the Facebook Messenger flirting – but it's clear that Ms. Hallich and Damien Nelson had begun a romantic relationship in June. They texted a lot and she left her door unlocked for him at night.

    In the beginning, Damien Nelson shared his music with her and sent her mp3s of his songs: "Southern Country Party," "No Luv," "Memory Lane," and "Bad for You."  She was impressed and thought he had the potential to become a star. He promised to spend time with her, but he was busy taking care of business. Then he started asking for things.

On July 2, 2020, Damien Nelson asked Ms. Hallich to apply for a two bedroom apartment for him in her name; they'd only been seeing each other for a week. When she explained that she couldn't, because she was still paying for an apartment for the last guy who screwed her over, Mr. Nelson asked her to apply for a new Land Rover for him in her name. But she assured him she wouldn't qualify for a $75,000 loan.

Then, Mr. Nelson sent her another posting for a $50,000 used Land Rover and Ms. Hallich still didn't think she would qualify for the loan. Ultimately, Mr. Nelson sent Ms. Hallich a link to a 2017 Mercedes-Benz, suggesting she would qualify for a $30,000 vehicle. He told her he already put $1,500 down for it and he just needed her to bring in her six paystubs for the financing – the car and loan would be in her name. Ms. Hallich responded in a long text.

> I just have to put this out there first before I do anything cuz I'm really nervous to do this and I hope you can understand. We don't even really know each other and $30k is a lot of fricken money (to me at least) I literally am just now to the point of having okay credit n I cannot f**k it up again, I'm 47 and it took me forever to rebuild my credit, I'm too old to be f**king sh*t up again, also u say that u can pay the payments but how do I know that for sure, how do I know ur not just gonna take the car n leave? Also ur going to have to insure it because there will be a loan on it n I don't have car insurance, because I have a company car so the insurance isn't in my name, don't we have to provide them with proof of insurance? I'm afraid if I do this ur gonna get what u wanted from me n just stop talking to me or blow me off, just like every other guy does to me, they get what they want n then they disappear. I can't keep hurting myself to help ppl who don't give af about what happens to me. I don't help ppl to get things in return by any means but I do expect ppl to be true to their word n follow thru with their end, especially since there is nothing for me to gain and I have everything to lose! I'm just so tired of having a good heart and ppl taking advantage of it and it scares the sh*t out of me to do this because I have no idea of what ur intentions are with me or what u want from me other than my help to get u a car. That's why I wanted to talk to you before we did anything cuz I have to protect myself. I don't need or want another "friend" that I have to take care of n like I said idk what

> it is u want with me! I'm at work now n I'll do my paystubs before I leave so I have them but I want to figure all of this out before I just go applying for a 30k loan.

Damien Nelson responded to Ms. Hallich's text and the manipulation started. He replied,

> We can sign a personal guarantee form I don't like to be compared to your ex because I'm not them I don't believe in f**king people over it's not the way I rock because I believe in karma i am not ur friend and I like to take care of Business and get it done I don't need a woman to provide for me I'm well self taken care of and i can pay that loan off and I will sign paper saying I'll pay it off

Thus, despite her instincts, Ms. Hallich obtained the loan for the Mercedes-Benz. Later, following days of manipulation, she also paid for airline tickets, hotel rooms, an Airbnb in Nashville for other people, and rental props that included a mechanical bull. She was told it was all needed for Damien Nelson's music video for one of his songs. Ms. Hallich never went to Nashville herself and was not invited on any of the trips she paid for.

In the end, Ms. Hallich paid a lot of money to "help" Damien Nelson, including taking out another car loan for a Tahoe. Buying guns at Bill's Gun Shop was just one of the many things she was manipulated into doing for him, to keep him in her life. The texts make it crystal clear.

Ms. Hallich had no idea that he was seeing multiple women or running a prostitution ring in Nashville. She realizes now, that she didn't know him at all and that she was totally used.

At sentencing, Ms. Hallich will stand before the Court after pleading guilty to one count of Conspiracy for making a false statement during the purchase of a firearm and providing the firearm to a felon, Damien Nelson. Ms. Hallich has received a copy of the presentence report and has no objection to the guideline calculation therein. However, in light of Ms. Hallich's own victimization, the circumstances of the offense, and other 18 U.S.C. § 3553(a) factors, she respectfully asks the Court to consider that a sentence of probation would be sufficient but no greater than necessary in this case.

I.     THE SENTENCING CONSIDERATIONS

In *Gall v. United States*, 128 S.Ct. 586 (2007), the United States Supreme Court clarified the two-step process to be followed in federal sentencing. The sentencing judge must first determine the guidelines range applicable to the defendant. *Id*. at 596. Then, the court must consider the factors in 18 U.S.C. § 3553(a) and determine whether a departure or a variance is appropriate. *Gall*, 128 S.Ct. at 596-97; *United States v. Pepper*, 131 S.Ct. 1229, 1241 (2011); *United States v. Roberson*, 517 F. 3d 990, 993 (8th Cir. 2008). In so doing, the Court is "to make an individualized assessment based on the facts presented" and must impose a sentence that is sufficient but not greater than necessary to accomplish the many goals of federal sentencing. *Id*.

In order to find the appropriate guidelines however, it is necessary to consider the background of a defendant and the nature and circumstances of the offense. For these reasons, the pleading will first address Ms. Hallich's history, what was happening in her life that led to the offense, and the offense itself.

**A. The History and Characteristics of Melissa Hallich**

Melissa Hallich grew up with two loving parents. Her mother was a customer service representative for General Mills and her father worked for the city of Maple Grove and was a volunteer firefighter. But Ms. Hallich's childhood was full of pain and drama.

Melissa's sister, P.G., had a personality disorder and behavioral problems from early childhood through adolescence. Melissa looked up to her older sister and loved her, but P.G. seemed to lack love and empathy and wanted nothing to do with Melissa. In fact, the only attention she paid to her was when she was beating her up.

P.G. ran away from home more than twenty times in all. And she was in and out of group homes. P.G. fought with her parents constantly and once assaulted Melissa's mother. In one incident, P.G. even set the house on fire because she wanted to live in a hotel. After it was put out and the home was saved, P.G. told her parents that Melissa started the fire.

P.G. was so out of control and difficult, Melissa's mother fell into a deep depression and attempted suicide. Fortunately, her mother lived and was treated for depression, but Melissa lived with the pain and constant fear that her mother would try again.

When P.G. was sixteen and Melissa was thirteen, P.G. became pregnant, but wanted nothing to do with the baby. She gave up all her parental rights. Thus, Melissa's parents and Melissa, herself, raised the baby.

Through all of the chaos caused by her sister, Melissa just wanted everyone to be happy. Her sister was in and out of their lives, her mother was depressed and Melissa always wanted to fix everything. She just wanted everyone to get along. She knew her

parents loved her, but most of their attention was on P.G., because it had to be. Melissa became the child who tried to please everyone and she avoided conflict at all cost.

At thirteen, Melissa got a job as a pool attendant at the Osseo Pool and has worked ever since. She also attended and completed high school in 1991 and took a few college courses. But, despite family counseling, her mental health was struggling and she was treated at a clinic for anxiety and depression when she started having panic attacks.

**Marriage & Dating**

In 1999, Ms. Hallich married J.E. after dating for years following high school. The couple had two daughters in 2001 and 2002 and J.E. was a good dad.

Unfortunately, after marriage, J.E. developed a drinking problem and became mean when he drank. He began to domestically abuse Ms. Hallich. She took his abuse for awhile, but when he punched her in the face while she was holding their baby daughter, she decided that she needed to leave. The abuse was getting worse. Thus, the couple separated in 2006.

From 2007-2009, Ms. Hallich was in a relationship with another man she knew from high school, N.B. At first he was doting and sweet, but after the couple moved in together, he became controlling and violent. He assaulted her many times, but she never called the police. He always apologized and made excuses and she felt sorry for him. He was very manipulative.

Eventually, Ms. Hallich left N.B. and moved in with her parents. But N.B. called incessantly and ultimately broke into her parents' home and demanded that she give him a ride and leave with him in her car. During the ride, N.B. tried to take her keys from the ignition, punched her in the face, and broke her windshield with his fist. When they finally

made it to where N.B. wanted to go, N.B. grabbed the keys and grabbed Ms. Hallich by the throat and held her off the ground, up against a wall. He strangled her so long that she thought she was going to die. When he finally released her, she made it to a phone and called the police. She filed a report and got a Domestic Abuse No Contact Order ("DANCO") against him.

Unfortunately, the DANCO did little to deter N.B. He continued to stalk and harass Ms. Hallich. He followed her to work and constantly sent her harassing emails. She continued to call the police each time, but nothing was done to protect Ms. Hallich and she gave up on relying on the police for protection. She moved out of her home and away from her children. She hid from him for months.

Eventually, N.B. stopped emailing, he stopped showing up places Ms. Hallich went, but for years she lived in constant fear that he would appear again. She looked over her shoulder everywhere she went. She worried that she would see him following her car again or that he'd approach her in a parking lot.

**A Good Man**

In 2012, Ms. Hallich finally found a good man. P.W. was kind, treated her respectfully, never tried to manipulate her, and never laid a hand on her. P.W. coached both of Ms. Hallich's daughters in hockey and her whole family loved him.

Around this time, Ms. Hallich also found full time employment as an office manager at a road construction company. She developed good relationships with everyone at work and became a valued employee. Her life felt full and she felt happy and safe for the first time in a long time.

Tragically, on October 14, 2014, Ms. Hallich and her daughters found P.W. dead on the bathroom floor. They were shocked and devastated. There were no health issues or warning signs. An autopsy simply found that P.W. had died of natural causes.

Following P.W.'s death, Ms. Hallich attempted to date other men, but her prior relationships made her feel helpless. She was depressed, lonely, and broken.

### B. The Circumstances of the Offense

Ms. Hallich has always had a difficult time saying "NO" to people. In reflection on her past, she believes that this characteristic comes from a life of growing up with her sister. She always wanted to fix everything and everybody and she tried hard to do so. She wanted to help make things better for her family and this seems to have become the essence of her personality.

When Ms. Hallich met Damien Nelson, he seemed to be a really nice guy and a good dad who was just struggling in his music career. He was sweet to Ms. Hallich, built up her confidence, and acted like he wanted to have a meaningful relationship with her. But almost immediately, he also started asking Ms. Hallich for help.

First, he wanted to get his own apartment where he could have partial custody of his son and where, he promised, Ms. Hallich and he could spend time together. But then, he also needed a new car and knew he wouldn't qualify for a loan, because he couldn't prove his income as an aspiring musician.

Then he needed a place to film his music video, models for his music video, and props. He just needed a break in the music industry and Nashville was the place to get it.

In all, Ms. Hallich was manipulated into spending over $100,000 on items for Damien Nelson. She never knew the number of women he was seeing or that he was asking other women to do the same types of things for him.

Buying Damien Nelson guns was just one more thing Ms. Hallich did for him. She felt uneasy about it, just like she initially felt uneasy about getting a $30,000 Mercedes-Benz, but she did it anyway. Ms. Hallich did so much just to help him and to try to keep their romantic relationship going.

She regrets buying the firearms and saying that the firearms were for herself on the application. She knew Damien Nelson was a felon, but she never believed him to be violent and never imagined that he was involved in promoting prostitution. In fact, when Damien Nelson was first arrested in 2018, he told Ms. Hallich that his ex-girlfriend had gotten him locked up again, as though it were no big deal. He made it seem as though she was just a cray ex-girlfriend who couldn't let go of him. She had no idea that Mr. Nelson had been charged with promoting prostitution or second degree criminal sexual conduct.

But again, he needed help. And again, Ms. Hallich put her name and $14,900 down to bail Damien Nelson out of jail with someone he claimed was his "sister." When Mr. Nelson was later taken into custody on the federal indictment, Ms. Hallich was served with papers from Midwest Bonding, LLC, informing her that she was being sued and her wages would be garnished for the unpaid balance of Damien Nelson's bond, $34,372.38. Ms. Hallich attempted to respond to this notice, but it was never recognized. Now, Ms. Hallich is about to have 25% of her income withheld as a garnishment to pay Midwest Bonding.

Today, Ms. Hallich admits that Damien Nelson is not the person she thought he was and she recognizes that she was conned into believing he was someone else. She had no idea that Mr. Nelson had a lengthy, violent criminal history.[1] She had no idea that he had seven prior felony convictions for domestic assault and/or felony violations of no contact orders. *Id*. at 15. She had no idea that he had eleven felony convictions, that he was sex-trafficking a female victim, or that he had raped that same victim. *Id*. And she certainly didn't know that he was using three different women to buy or attempt to buy eight firearms. *Id*. She never believed for a minute that he was a danger to society. If she knew any of these things, she never would have purchased those guns.

## II.   THE STATUTORY 18 U.S.C. § 3553(a) FACTORS

The Supreme Court requires judges "to impose a sentence sufficient, but not greater than necessary to comply with the basic aims of sentencing" in § 3553(a), *Rita v. United States*, 127 S.Ct. 2456, 2463 (2007). These basic aims include the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; to create adequate deterrence; to protect the public from further crimes of the defendant and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a). But it also gives sentencing courts "a broad command to consider 'the nature and circumstances of the offense and the history and characteristics of the defendant.'" *Gall v. United States*, 128 S.Ct. 586, 596 n.6 (2007).

---

[1] *United States v. Damien Lashaun Nelson*, Sentencing Transcript, 20-CR-302 (ADM/ECW), October 7, 2021.

A criminal sentence, therefore, should adequately address and reflect how an individual got to this point in life. As noted by Senior Judge Bright in his concurring, pre-*Booker* opinion, "[s]entences ought to balance punishment with societal needs as well as some concern for the offender." *United States v. Stockton*, 968 F.2d 715, 721-722 (8th Cir. 1992) (J. Bright concurring).

It is important to note that Ms. Hallich has never been in trouble like this before. She has lived a law-abiding life and has been victimized by a number of men who have assaulted her, mentally abused her, and used her. She is another victim of Damien Nelson's manipulation. She knows that she needs to choose better men and to make better choices and she concedes that therapy would be helpful.

It is also important to note that the other two female straw purchasers were *not* indicted for buying or attempting to buy Damien Nelson guns by falsely representing that the firearms would be for themselves. These women were also manipulated by Damien Nelson, but for one reason or another, avoided federal prosecution for their offenses.

Thus, although purchasing firearms for a felon is a serious offense, it is important to note that this case is unlike others. Ms. Hallich did not benefit from the purchase of the firearms. She did not make any money or receive anything in return for her crime. She is not addicted to drugs and she did not *knowingly* provide them to someone with a violent record. She knew that Damien Nelson was a felon, but he explained that he was falsely accused of assault by an ex-girlfriend. It was just like everything else he explained away.

It is also significant that Ms. Hallich has already been punished in number of ways. First, Ms. Hallich has been completely humiliated by the offense and the

manipulation to which she has succumbed. Her daughters, parents and the world will know that she is a federal felon at the age of 48, because she believed in a man. She is very ashamed of her behavior and did not tell her parents about the charges for a very long time.

    Second, Ms. Hallich has ruined her financial credit and is now ordered to pay Midwest Bail Bonds approximately $34,000 for bonding Damien Nelson out of custody. Once her wages are garnished at 25%, she will be financially destitute, despite having a good job that values her work.

    Third, Ms. Hallich has always been a gun owner herself and enjoys going to the firing range with her elderly father. They have always had firearms for sporting purposes. This bond and time together has always meant a lot to both Ms. Hallich and her father as her sister, P.G., has been estranged from the family for at least five years. Ms. Hallich will no longer be permitted to possess firearms or use them for sporting purposes.

    Finally, Ms. Hallich is extremely remorseful for her conduct. She has always tried to bring positivity to the world and never would have intentionally armed a dangerous person who might have hurt someone. Everyone who knows her, knows that she is a good person who is always trying to help others. She is glad that Mr. Nelson is serving a long sentence and is relieved that he cannot hurt her nor anyone else for a very long time.

### III.   CONCLUSION

In conclusion, Ms. Hallich respectfully asks the Court to consider that a sentence of probation with conditions would be sufficient under the circumstances. Additional punishment is not needed to mete out the goals of federal sentencing. Ms. Hallich has

clearly learned a difficult lesson and having a federal felony on her record will continue to remind her of her mistake for the rest of her life.

Dated: November 3, 2021                    Respectfully submitted,

*s/ Shannon Elkins*

SHANNON ELKINS
Attorney ID No. 332161
Attorney for Ms. Hallich
107 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415